UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>KUJALI STRAWTHER,<br><br>Defendant. | 4:22-CR-40133-KES<br><br>REPORT AND RECOMMENDATION |

## INTRODUCTION

Defendant Kujali Strawther is before the court on an indictment charging him with Possession of an Unregistered Machinegun in violation of 26 U.S.C. §§ 5841, 5861(c), and 5871; Possession of a Machinegun in violation of 8 U.S.C. § 922(0); and Possession of a Firearm by a Prohibited Person in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2).  See Docket No. 19.  Mr. Strawther  moves to suppress certain evidence.  See Docket No. 28.  The United States ("government") resists the motion.  See Docket No. 29.  This matter has been referred to this magistrate judge for holding an evidentiary hearing and recommending a disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and D.S.D. LR 57.11.

## FACTS

An evidentiary hearing was held on April 12, 2023. Mr. Strawther was there in person along with his lawyer, Hannah Moravec. The government was represented by its Assistant United States Attorney, Paige Peterson. Three witnesses testified and nine exhibits were received into evidence. From this testimony and these exhibits, the court makes the following findings of fact.

South Dakota Highway Patrol Trooper Eric Peterson is a six-year veteran of the South Dakota Highway Patrol. He is trained in narcotics and narcotics detection. He and his police service dog Drago are certified in certain narcotic odors, but Drago is not trained to detect the odor of marijuana. Trooper Peterson attended the National Interdiction Conference for additional training. Trooper Peterson is familiar with the odor of burnt marijuana. In his capacity as a highway patrolman, he has come across the odor of marijuana many times.

On November 21, 2022, defendant Kujali Strawther was driving a rental car eastbound on Interstate 90 ("I-90"). Trooper Peterson and South Dakota Highway Patrol Sergeant ("Sgt.") Josh Olson were on stationary patrol near mile marker 395 on I-90. Trooper Peterson testified that he and Sgt. Olson were positioned by the Marion Road exit, just west of the intersection between I-90 and Interstate 29 ("I-29"). Trooper Peterson marked the position of the patrol vehicles on a Google Earth map. Ex. C. He also marked on the exhibit the location of what he believed was the sign indicating the change of speed limit from 80 miles per hour to 65 miles per hour at the bridge on I-90. Id.

Trooper Peterson was stationed just east of where the speed limit changes from 80 miles per hour to 65 miles per hour on I-90. Before going on duty that day, Trooper Peterson testified that he ran an internal test and tuning fork test on his radar device at the beginning of his shift, as was his usual practice. The radar device's calibration had been certified by a third-party lab November 30, 2018, and Trooper Peterson testified his own testing revealed the device was working accurately. Ex. 1.

At approximately 2 p.m., Trooper Peterson observed a white, newer model SUV that appeared to be traveling over the posted speed limit of 65 miles per hour. Trooper Peterson went through the tracking history to get a speed estimate. He estimated the vehicle was going approximately 80 miles per hour. Trooper Peterson then used his radar device on the vehicle which indicated a speed of 74 miles per hour in the 65 mile-per-hour zone. Trooper Peterson testified that when the radar was used, the vehicle had begun to slow down to take the Marion Road exit.

After confirming the speeding violation with Sgt. Olson, Trooper Peterson exited his stationary position and turned onto the Marion Road exit. Trooper Peterson ran his pre-stop checks on the vehicle while following Mr. Strawther south on Marion Road. He initiated his lights at the intersection of North 60th Street and Marion Road.[1] Mr. Strawther turned left onto North

---

[1] Video of Trooper Peterson's dash cam begins 30 seconds before the patrol car lights were initiated. Ex. 3. There is no audio available with this video. Trooper Peterson testified that the audio on his body cam was inadvertently turned off.

60th Street (headed east), turned onto Annika Avenue, then came to a stop on West 61st Street. Ex. C (Trooper Peterson marked the stop TS).

Defense expert Peter Zenner, who has been an investigator for the Federal Public Defender's Office for 16 years, also testified. He primarily works in traffic investigations. Mr. Zenner based his findings on having driven the stretch of road in question. He testified that the distance between the 65 miles per hour speed limit sign and the Marion Road exit is about a quarter of a mile. See Ex. C. Mr. Zenner stated that a driver located at the speed limit sign could see the exit, and a driver located at the exit could see the speed limit sign. Mr. Zenner testified that the distance between the Marion Road exit and the traffic stop was approximately one mile.

Once Mr. Strawther's vehicle stopped, Trooper Peterson approached the passenger side of the vehicle 1:40 into the stop. Ex. 3 at 1:40. He testified that he spoke with the adult female passenger, and Mr. Strawther, who was in the driver's seat. He also observed four children in the vehicle. Trooper Peterson asked for Mr. Strawther's driver's license and registration. Trooper Peterson testified that he informed Mr. Strawther that he was going to issue a warning citation for speeding. Mr. Strawther produced a rental agreement for the vehicle. See Ex. B. Trooper Peterson testified that he smelled the odor of burnt marijuana emanating from the passenger-side window.

Mr. Strawther got into Trooper Peterson's patrol car 4:29 into the stop.[2] Ex. 4 at 4:29. Mr. Strawther was wearing a high collared shirt and a loose fitting zipped up coat. Id. Mr. Strawther made small talk while Trooper Peterson ran checks on his laptop. Id. Trooper Peterson left the patrol vehicle to check the VIN number on the rental car and to check on the female and child passengers. Ex. 3 at 8:58-11:53. There is no audio evidence of Trooper Peterson's conversation with the female passenger. Id. at 10:39. Trooper Peterson testified that he asked the female passenger whether Mr. Strawther smoked marijuana. The female passenger supposedly told Trooper Peterson that Mr. Strawther likely had some marijuana in a "sling-type" bag in the vehicle.

Trooper Peterson returned to the patrol car and informed Mr. Strawther that he smelled burnt marijuana at the passenger-side door and asked him if he had any marijuana in the vehicle. Ex. 5 at 5:31. Mr. Strawther denied there was any marijuana in the vehicle. Id. at 5:36. Mr. Strawther admitted to smoking marijuana in the vehicle back in California. Id. at 5:55. He did not possess a South Dakota medical marijuana card. Id. at 8:15. Trooper Peterson testified that during this exchange, Mr. Strawther "really opened his eyes, and I could see his heartbeat begin to pound more underneath his clothing in his stomach, and I could see his bottom lip quivering."

---

[2] Video of Trooper Peterson's in-cab cam is Exhibit 4. Audio of the in-cab cam is Exhibit 5. The timing of the audio lines up with the video at 4:12. For clarity, the court will reference the timestamps as presented in the evidence.

The court finds that Trooper Peterson's description of Mr. Strawther is not credible in several respects.  Trooper Peterson was outside the patrol car leaning in during the conversation.  He would not have seen Mr. Strawther's heartbeat in his stomach and his lips quiver given his positioning, and Mr. Strawther's loose coat and high-collared shirt.  The court has reviewed the video evidence and finds that Mr. Strawther *was*, however, visibly animated, gesturing with his hands, eyebrows lifted, and his eyes were large.  Ex. 4 at 9:45.  He was nervously talking and laughing.  Ex. 5 at 5:31-8:26.  The court did not observe Mr. Strawther's pulse in his stomach or his lip quivering.  Trooper Peterson testified that he did not believe that Mr. Strawther was under the influence of marijuana or any other drug.

Trooper Peterson informed Mr. Strawther that he was going to search the vehicle based on the odor of marijuana.  Id. at 8:26.  Trooper Peterson testified that he made the determination to search the vehicle upon the confirmation of marijuana odor when he returned to the vehicle to talk with the female passenger.  Trooper Peterson asked Mr. Strawther for honesty, and Mr. Strawther admitted to having two pounds of marijuana in the vehicle for personal use.  Id. at 10:03.  He then told Trooper Peterson that the marijuana was in the back of the vehicle.  Id. at 11:22.

Trooper Peterson called for assistance for the search.  Trooper Hup responded within approximately 5 1/2 minutes, 17 minutes into the stop.  Ex. 3 at 17:41.  Trooper Hup testified that he could smell the odor of burnt marijuana inside the vehicle, although he did not voice this statement

6

contemporaneously at the scene of the stop. Sgt. Olson also arrived on scene before the vehicle search. See Ex. 6 at 5:00.

Trooper Peterson testified that he communicated his observations of the speeding vehicle to Sgt. Olson before the stop and again at the time of the stop. Sgt. Olson did not testify.[3] A conversation about Mr. Strawther's speed between Mr. Strawther, Trooper Peterson, and Sgt. Olson was recorded by Trooper Hup's dash camera. Ex. 6 at 5:19. Trooper Peterson stated, "I saw it was 74." Id. Sgt. Olson's response is inaudible.[4] Trooper Peterson's response to Sgt. Olson was, "oh really?" Id. at 5:22. Trooper Peterson testified that Sgt. Olson confirmed the speeding before the stop—that Mr. Strawther was traveling above 74 miles per hour, closer to 80, and was "flying or traveling fast." The warning citation issued to Mr. Strawther the day of the stop stated a speed of 74 miles per hour. Ex. 2.

The vehicle search began approximately 21 minutes into the stop. Less than one minute into the vehicle search, Trooper Peterson found 3 bags of marijuana—2.13 pounds' worth—located in a duffle bag in the back of the vehicle. Ex. 3 at 21:17-21:34. Trooper Peterson testified that no other drug

---

[3] Counsel for the government indicated Sgt. Olson was out of town and unavailable to testify the day of the evidentiary hearing.

[4] Trooper Hup's patrol vehicle that captured the audio was stationed behind Trooper Peterson's vehicle at the stop. Distance from the conversation coupled with noise from the patrol car engine distorted the audio. Trooper Peterson and government counsel asserted that Sgt. Olson can be heard to say that he had Mr. Strawther's vehicle traveling at 80 miles per hour in the 65 mph zone, but the court could not discern this in the audio provided.

7

paraphernalia was found in the vehicle. During the search, Trooper Hup is heard commenting on the lack of paraphernalia. "You'd think [you'd] see [pipes/papers and stuff]] if [Strawther] was smoking that much weed. . . . so, I think you found what you found." Ex. 3 at 24:08-24:39.

Trooper Peterson testified that he located a gun in the female passenger's purse that was located on the passenger-side floor. He can be seen removing the gun from the vehicle in the dash cam video. Id. at 29:33. Trooper Peterson testified that when he observed the firearm, it had a device on the rear that he believed to be a Glock or sear switch, which allows the weapon to be fired like an automatic weapon. Mr. Strawther was arrested for possession of the firearm and placed in Trooper Peterson's vehicle. Ex. 6 at 11:55.

The vehicle search concluded approximately 42 minutes into the stop. (Sgt. Olson began to load bags back into Mr. Strawther's vehicle). Ex. 3 at 42:36. Sgt. Olson and his K-9 performed a training sniff on Strawther's vehicle after the search.[5] Ex. 3 at 46:15. Troopers talked with the female passenger for several minutes before transporting Mr. Strawther to the law enforcement center. Id. at 56:44-1:00:05. Transport to the law enforcement center took approximately 13 minutes. Id. at 1:00:05-1:12:59. Trooper Peterson testified that Mr. Strawther was Mirandized and waived his Miranda rights.[6] During

---

[5] This training sniff was not mentioned in Trooper Peterson's report. Trooper Peterson is a K-9 handler. His K-9 was on scene at the time of the stop. He testified that his K-9 is not trained to detect the odor of marijuana. Sgt. Olson's K-9 is trained to detect marijuana. Trooper Peterson testified that he did not rely on a K-9 sniff for probable cause to search Mr. Strawther's vehicle.

[6] Mr. Strawther does not raise a Miranda issue in this suppression motion.

transport Mr. Strawther made several voluntary statements to Trooper Peterson.  See Ex. A at 00:45-1:41.

Trooper Peterson's incident report was dated Friday, November 25, 2022, four days after the traffic stop.  Trooper Peterson testified that he typically begins writing his reports in Microsoft Word and would have started the report immediately to submit a probable cause affidavit to book Mr. Strawther into the jail.  He testified that the date on the report was just the date he entered the report into the Highway Patrol database.

## DISCUSSION

**A.     Whether the Traffic Stop was Unconstitutional.**

The first issue raised by Mr. Strawther is whether the traffic stop was unconstitutional.  Docket No. 28-1, p. 6.  Mr. Strawther argues that there is insufficient evidence that a traffic violation occurred.  Id.  The government responds that Trooper Peterson had developed reasonable suspicion that Mr. Strawther was speeding.  See United States v. Gaffney, 789 F.3d 866, 868 (8th Cir. 2015).

The Fourth Amendment to the United States Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.  Fourth Amendment protections extend to persons in their automobiles.  Delaware v. Prouse, 440 U.S. 648, 663 (1979) (citing Adams v. Williams, 407 U.S. 143, 146 (1972)).  A traffic stop constitutes a seizure within the meaning

of the Fourth Amendment.  United States v. Martinez, 358 F.3d 1005, 1009 (8th Cir. 2004).

"[A] relatively brief encounter," a routine traffic stop is "more analogous to a so-called 'Terry stop' . . . than to a formal arrest."  Rodriguez v. United States, 575 U.S. 348, 354 (2015) (citing Knowles v. Iowa, 525 U.S. 113, 117 (1998); Terry v. Ohio, 392 U.S. 1 (1968)).  A Terry stop must be supported by reasonable suspicion or probable cause.  Terry, 392 U.S. at 21-22, 27; United States v. Holly, 983 F.3d 361, 364 (8th Cir. 2020) ("Under the Fourth Amendment, a traffic stop is reasonable if it is supported by either probable cause or an articulable and reasonable suspicion that a traffic violation has occurred.")

An officer making a Terry stop based on reasonable suspicion, must be able to articulate something more than an "incohate and unparticularized suspicion or hunch."  United States v. Sokolow, 490 U.S. 1, 7 (1989).  Officers must have "a particularized and objective basis for suspecting the particular person of criminal activity."  Navarette v. California, 572 U.S. 393, 396 (2014).  Reasonable suspicion in support of a Terry stop "is dependent upon both the content of information possessed by police and its degree of reliability."  Id. (quoting Alabama v. White, 496 U.S. 325, 330 (1990)).

In evaluating the standard, courts must consider the totality of the circumstances.  Id.  "[T]he constitutional reasonableness of a traffic stop does not depend on the actual motivations of the officer involved, and the subjective intentions of the officer making the stop are irrelevant in determining the

validity of the stop." United States v. Herrera-Gonzales, 474 F.3d 1105, 1109 (8th Cir. 2007);  see also United States v. Andrews, 465 F.3d 346, 347 (8th Cir. 2006) (per curiam) ("[T]he fourth amendment is not violated if an objectively good reason for a traffic stop exists, whatever the actual subjective motive of the officer making the stop may have been.").

"A police officer may stop a vehicle when he or she has probable cause to believe that the driver has committed a traffic violation." United States v. Andrews, 454 F.3d 919 at 921 (8th Cir. 2006) (citing Whren v. United States, 517 U.S. 806, 810, (1996)).  Probable cause exists when a reasonable officer, confronted with the facts known to the officer at the time of the stop, could have believed that there was a fair probability that a violation of law had occurred.  Id.; see Illinois v. Gates, 462 U.S. 213, 238, (1983); United States v. Thomas, 93 F.3d 479, 485 (8th Cir. 1996).

"An officer has probable cause to conduct a traffic stop when he observes even a minor traffic violation.  'This is true even if a valid traffic stop is a pretext for other investigation.' " United States v. Sallis, 507 F.3d 646, 649 (8th Cir. 2007) (quoting United States v. Linkous, 285 F.3d 716, 719 (8th Cir. 2002)).  Exceeding the speed limit provides a justifiable reason for a traffic stop, even if the officer is acting on a tip that the vehicle is involved in transporting drugs and said tip would not, by itself, provide justification for the stop.  Sallis, 507 F.3d at 649-650 (citing United States v. Stapleton, 10 F.3d 582, 583-584 (8th Cir. 1993)).  This is true even if the officer would not

11

ordinarily stop a car exceeding the speed limit by only five to ten miles per hour.  Id.

Mr. Strawther relies on Andrews in asserting the stop was unconstitutional for lack of evidence of a traffic violation.  The government responds by arguing that Gaffney, not Andrews, should apply.

In Andrews, a driver was stopped by an officer for "follow[ing] another vehicle more closely than is reasonable and prudent," a violation of Neb. Rev. Stat. § 60–6,140(1).  Andrews, 454 F.3d at 920.  The officer testified that he used the so-called two-second rule to determine whether Andrews violated the traffic law.  Id. at 921.  The rate of speed and distance was disputed between the officer's and Andrew's testimony.  Id.  The district court found the officer's testimony to be "contradictory" and that the officer had no objective basis for the stop.  Id. The Eighth Circuit remanded the case to the district court for clarification on the factual findings.  Id. at 922.  On the re-appeal, the Eighth Circuit affirmed the district court's finding that the officer's testimony that Andrews was following too close was not credible.  United States v. Andrews, 465 F.3d 346, 347 (8th Cir. 2006).

In Gaffney, a driver was stopped based on the officer's visual estimate that there was a speeding violation.  Gaffney, 789 F.3d at 867.  The officer lacked experience in speed violations and could not remember whether he activated his radar.  Id. at 868.  The Eighth Circuit included analysis from Fourth Circuit case law:  "[A]t a minimum, there must be sufficient indicia of reliability for a court to credit as reasonable an officer's visual estimate of

12

speed." Id. at 869 (quoting United States v. Sowards, 690 F.3d 583, 591-93 (4th Cir. 2012) (indicia of reliability may be supported by radar, pacing methods, or another officer's corroboration)).

The district court concluded that despite the disputed estimate of Gaffney's actual speed, the officer's belief that Gaffney was speeding was objectively reasonable. The officer was familiar with the area, Gaffney "braked hard" immediately after the officer began to follow him, and the investigator's measurement of speed averaged over the speed limit. Id. at 869-870. The Eighth Circuit affirmed the lower court while Judge Bye dissented. Judge Bye found that the officer lacked the credentials to visually estimate speed and that his speed estimate lacked corroboration. Id. at 871. (Bye, J. dissenting).

This court finds that Trooper Peterson had reasonable suspicion to stop Mr. Strawther because he was speeding. There is not a lack of evidence as Mr. Strawther suggests. Trooper Peterson was stationed at the Marion Road exit, a location that Mr. Zenner testified would be close enough to observe a speeding vehicle in the 65 mile-per-hour zone. As in Gaffney, Trooper Peterson's visual observations were sufficiently corroborated. Trooper Peterson verified Mr. Strawther's speed with tracking history and his radar device. He also conferred with Sgt. Olson prior to initiating the stop. Trooper Peterson noted the excessive speed of 74 miles per hour in the 65 mile-per-hour zone on Mr. Strawther's warning citation that was issued the same day as the traffic stop. Trooper Peterson made contemporaneous recorded statements at the stop that his radar revealed Mr. Strawther was driving 74

13

miles per hour. Further, Trooper Peterson had credentials for informing his visual estimate of speed. He is a six-year veteran of the South Dakota Highway Patrol who has performed numerous traffic violation stops and he is familiar with that stretch of I-90.

Nowhere in the evidence was Trooper Peterson's testimony "contradictory" as in Andrews. Mr. Strawther neither admitted nor denied speeding. The only other indicator of Mr. Strawther's speed was from Sgt. Olson who did not testify and whose audio was not preserved. Trooper Peterson testified that Sgt. Olson believed that Mr. Strawther was going closer to 80 miles per hour. Regardless of Sgt. Olson's own observations, evidence consistently showed that Mr. Strawther was traveling over the posted speed limit of 65 miles per hour. The government has sufficiently met their burden to demonstrate that Trooper Peterson had reasonable suspicion to stop Mr. Strawther.

**B.     Whether the Duration of the Traffic Stop Was Unconstitutional.**

Relying on Rodriguez and Peralez, Mr. Strawther argues the police unconstitutionally prolonged the duration of the traffic stop beyond what was necessary to issue a warning citation. Docket No. 28-1 at p. 7. The government, relying on United States v. Lyons, 486 F.3d 367, 371 (8th Cir. 2007), argues that Trooper Peterson developed reasonable suspicion of criminal activity, justifying the extension of the stop. Docket No. 29, p. 11.

The Supreme Court outlined the law applicable to the duration of traffic stops: a constitutionally permissible traffic stop (one supported by probable

14

cause or reasonable suspicion), can violate the Fourth Amendment when its length exceeds the time needed to attend to the stop's mission and related safety concerns. Rodriguez, 575 U.S. at 354. A traffic stop may be continued until the "tasks tied to the traffic infraction are—or reasonably should have been—completed." Id. However, when "complications arise" in addressing the initial reasons for the traffic stop, the Fourth Amendment permits police to detain the driver "for a longer duration" than would be "strictly routine." United States v. Olivera-Mendez, 484 F.3d 505, 510 (8th Cir. 2007)).

In Peralez, an officer found nothing "unusual or out of place" with the driver's license or vehicle registration; the stop was delayed entirely because of the officer's drug-interdiction questioning. United States v. Peralez, 526 F.3d 1115, 1120 (8th Cir. 2007). Unlike in Peralez, the length of the stop was directly related to Trooper Peterson's detection of the odor of burnt marijuana and the investigation that followed. Cf. United States v. Davis, 943 F.3d 1129, 1133 (8th Cir. 2019) ("This stop is easily distinguishable [from Peralez] and involves traditional bases of reasonable suspicion justifying an extension.").

In Lyons, an officer prolonged a stop for a speeding violation after learning of the driver's unusual itinerary, observing a large amount of luggage, and receiving conflicting stories from the driver and passenger. Lyons, 486 F.3d at 372. The officer who was trained in highway drug interdiction extended the stop for the arrival of a drug dog which took 25 minutes to arrive. Id. The Eighth Circuit found that the officer had developed reasonable suspicion that criminal activity was occurring—specifically that there was contraband in the

vehicle. Id. That articulable reasonable suspicion justified prolonging of the stop. Id. (Officers were not dilatory in their investigation and there was no evidence of unnecessary delay.)

Reasonable suspicion of illegal activity such as the detection of the odor of marijuana by an officer is justification for prolonging a traffic stop. United States v. Wicahpe Milk, ___ F.4th ___, No. 21-3722 at p. 7 (8th Cir. May 3, 2023) (citing United States v. Williams, 955 F.3d 734, 737 (8th Cir. 2020)); see also United States v. Walker, 840 F.3d 477, 483 (8th Cir. 2016) ("The odor of unburned marijuana can be highly probative in establishing probable cause for a search."); United States v. McCoy, 200 F.3d 582, 584 (8th Cir. 2000) (smell of burnt marijuana justified prolonging the stop and conducting a search). United States v. Caves, 890 F.2d 87, 89 (8th Cir. 1989) (The odor of marijuana gave officers probable cause to investigate and eventually search the vehicle).

Trooper Peterson was familiar with the odor of marijuana. Although the legality of marijuana varies among the 50 states under state law, as of the writing of this opinion, marijuana is illegal under federal law (Controlled Substances Act, 21 U.S.C. § 801) and illegal in South Dakota without a medical marijuana card. See 21 U.S.C. § 812; SDCL §§ 22-42-6, 22-42-24, 24-20G-1.

Mr. Strawther argues that the stop should have lasted only as long as necessary for Trooper Peterson to issue the warning citation. However here, Trooper Peterson testified that he immediately smelled the odor of burnt marijuana emanating from the passenger-side door. Mr. Strawther next argues that the lack of paraphernalia found in the car suggests Trooper Peterson could

16

not have possibly smelled burnt marijuana because there were no devices found in the car for smoking marijuana. The court finds this argument lacks merit. The existence of marijuana in a vehicle or on a person is not premised on the existence of pipes, rolling papers, lighters, etc. Further, no evidence would be preserved if a blunt or a roach had been smoked in the vehicle prior to a stop.

Video and audio evidence shows that Mr. Strawther instigated conversation with Trooper Peterson in the patrol car while Trooper Peterson ran checks on his laptop. Trooper Peterson told Mr. Strawther about the marijuana odor 5 minutes and 30 seconds after Mr. Strawther entered the patrol vehicle. Trooper Peterson verified that Mr. Strawther did not have a South Dakota medical marijuana card. Approximately 8 minutes and 30 seconds into the stop, Trooper Peterson informed Mr. Strawther that he was going to search the vehicle based on the odor of marijuana. Trooper Hup arrived in roughly 5 minutes and 30 seconds to assist with the search. The search of the vehicle began 21 minutes into the stop. Within the first two minutes, the marijuana was found. The gun was found within 10 minutes. The search lasted approximately 23 minutes and at the conclusion, Mr. Strawther was arrested for the possession of the firearm. The total stop lasted approximately 1 hour.

This court finds that the length of the stop was justified based on Trooper Peterson's reasonable suspicion that Mr. Strawther possessed marijuana, a crime under federal and South Dakota state law.

Trooper Peterson verified his suspicions by questioning Mr. Strawther, the female passenger, and returning to the vehicle to detect the odor a second time. The government has sufficiently met their burden of demonstrating that the length of the stop was reasonable.

At the hearing, defense counsel for Mr. Strawther made several arguments as to Trooper Peterson's credibility. First, counsel took issue that Trooper Peterson filed the incident report four days post-stop. At the hearing, Trooper Peterson testified that he started drafting the report in Microsoft Word the day of the stop and continued working on the report until filing it. The court finds this explanation plausible as to the delay in reporting.

Second, counsel took issue with the fact that Trooper Peterson did not mention the K-9 sniff by Sgt. Olson and his K-9 in his report. Trooper Peterson testified that Sgt. Olson performed a training sniff with his K-9 after the search. He stated that training sniffs are not typically documented and found it was not relevant. The court finds this to be plausible as Trooper Peterson did not rely on a K-9 sniff for probable cause to prolong the stop or search Mr. Strawther's vehicle.

Third, counsel addressed Trooper Peterson's body mic being turned off. Trooper Peterson admitted that he did not know how the body mic operated, but that he has known body mics to inadvertently shut off when an officer bends over. The court finds this explanation plausible. If Trooper Peterson intended to disable his body mic, it would follow he would have disabled the other recording devices. This did not happen. A full audio and video recording

of his in-cab interactions with Mr. Strawther from his dash cam were provided to the court.  In short, with the exception of Trooper Peterson's assertion he could see Mr. Strawther's pulse in his belly through his jacket, the court generally credits Trooper Peterson's testimony.

C. **Suppression of Statements and Evidence under the Exclusionary Rule.**

Mr. Strawther argues that under the exclusionary rule, evidence obtained in violation of the Fourth Amendment should be suppressed.  Docket No. 28-1, p. 9; Mapp v. Ohio, 367 U.S. 643, 654 (1961).  He argues that the discovery of the firearm, marijuana, and his statements are a direct result of the unconstitutional traffic stop, and the unconstitutional length of that stop.  This court has found that the government has met their burden of showing that both the traffic stop, and length of the stop were constitutional.  Thus, the firearm, marijuana, and Mr. Strawther's statements should not be suppressed.

## CONCLUSION

Based on the foregoing facts, law and analysis, this magistrate judge respectfully recommends denying Mr. Strawther's motion to suppress in its entirety [Docket No. 28].  Both the traffic stop, and length of the traffic stop, and the search were constitutional.

## NOTICE TO PARTIES

The parties have fourteen (14) days after service of this report and recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained.  Failure to file timely objections will result in the waiver of the right to appeal questions of fact.

Objections must be timely and specific in order to require de novo review by the district court. Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990); Nash v. Black, 781 F.2d 665 (8th Cir. 1986).

DATED this 3rd day of May, 2023.

BY THE COURT:

VERONICA L. DUFFY
United States Magistrate Judge